IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| vs. | § § § | NO. 5-21-CR-00356-FB |
| JAROD TURNER,<br>    *Defendant*. | § § § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant Jarod Turner's Motion to Suppress. *See* Dkt. No. 26 (motion, hereinafter "Mot."); Dkt. No. 31(Gov't response). The District Court referred the motion, and this Court held a hearing on October 12, 2022. Dkt. Nos. 34 (motion to continue by Defendant), 40 (hearing minute entry), 42 (hearing transcript, hereinafter "Tr."). Defendant and the Government each filed briefing after the hearing. *See* Dkt. Nos. 45 (Defendant's post-hearing brief), 46 (Gov't post-hearing brief). Jurisdiction for this Report and Recommendation derives from 28 U.S.C. § 636(b)(1). *See also* Local Rule CR-58; App. C to Local Rules.

For the reasons discussed below, the Motion to Suppress, Dkt. No. 26, should be **DENIED**.

**Background**

On September 5, 2020, at 5:23 p.m., Bexar County Sheriff's Office Deputy Calderon pulled over the car driven by Defendant Jarod Turner. Events escalated, leading eventually to Turner's arrest after being tased at the conclusion of a foot chase. After Turner's apprehension following the chase, officers found a loaded gun magazine in his pocket. In his car officers found a pistol

1

and an unopened cartridge of THC oil in the center console as well as several ounces of marijuana in the trunk.

Starting back at the beginning, the scenario began with Deputy Calderon sitting in his parked patrol car on the side of Villa Street in San Antonio. As Turner's vehicle passed by, Calderon noticed it lacked a registration sticker, which isn't in dispute. Tr. at 6:18-20, 67:10-12. After Turner drove past, Calderon pulled his patrol car around and onto the road to follow Turner. *See* Tr. at 65:19-66:10. According to Calderon, and disputed by Turner, Turner's car pulled up to a stop sign, rolled through the stop sign, and then turned right onto Montgomery. Tr. at 6:23-25. Turner testified that he stopped at the stop sign completely before turning onto Montgomery. Tr. 66:9-10. There's no dispute that once Calderon was on Montgomery behind Turner, Calderon turned on his patrol car's lights on and directed Turner to pull over. Turner pulled off the road and into the parking lot for a tire shop on Montgomery. Tr. at 7:1-7, 66:10-15.

With Turner pulled over in the tire shop's parking lot, Calderon got out of his patrol car and approached Turner's car. Although equipped with a body-worn camera, Calderon didn't activate the camera at this time. Tr. at 24:15-17. Calderon testified that as he approached Turner's car, he "smelled an odor of marijuana" and so "asked the driver [Turner] of the vehicle to step out." Tr. at 7:17-21. Turner testified that Calderon simply walked up to Turner's car, told Turner to get out of the car, and then "he [Calderon] just started to arrest me." Tr. 66:17-19. Calderon agreed that he never asked for Turner's license and registration but instead moved immediately to secure Turner. Tr. 24:18-25.

Turner initially complied and got out of his car. Calderon then began to place him in handcuffs. It is at this point, as Turner exited his car and turned around to be handcuffed, that Calderon's body-worn camera began to record, albeit without sound for the first 30 seconds. *See*

2

Gov't Ex. 2A. According to Calderon, he explained at this point to Turner that "you're not – you're not under arrest. You're just being detained." Tr. at 8:2-3. But according to Turner, Calderon "did not greet him, did not explain why he had been pulled over, and did not explain why he was demanding that [ ] Turner step out of the vehicle." Mot. at 3; *see also* Tr. at 66:17-22.

And although Turner initially complied with Calderon's instructions, once Calderon handcuffed one of Turner's hands and moved to secure the other in the cuffs, Turner "started to push back." Tr. at 8:14; *see* Gov't Ex. 2A at 0:00:08. Turner testified that he noticed at the time that Calderon hadn't asked for his "name or license or registration. He didn't do that. And he didn't tell me why he was trying to put handcuffs on me after that." Tr. at 66:24-65:3. As this happened, Turner explained at the hearing, he was "concern[ed]," Tr. at 66:24, and also "uncomfortable and scared" "because of the stuff that was going on at the time, even now, with like police brutality and stuff like that, especially with males of my color." Tr. at 67:5-9.

As Calderon tried to secure Turner's second hand in the cuffs, a struggle ensued, and Calderon took Turner to the ground. Tr. at 9:4. The two men then wrestled, perhaps for a minute or a minute and a half according to Calderon's recollection. Tr. at 9:5-8. The video from Calderon's body-worn camera shows a struggle that appears to last approximately one minute. *See* Gov't Ex. 2A-1 at 0:00:15-0:01:16. A delivery driver was present and witnessed the scuffle, as did "some mechanics at the tire shop." Tr. at 9:10-11. After wrestling for some time, Turner was able to shed his shirt and flee on foot. Gov't Ex. 2A-1 at 0:01:16.

At this point, backup arrived in the form of Officer Campos, who pulled up in his patrol car. *See* Gov't Ex. 2B (video from Campos's body-worn camera) at 0:00:38. Campos drove up to the scene just as Turner took off running down the road. Campos immediately got out of his car and gave chase on foot. *Id*. at 0:00:42. As Campos ran after Turner, Campos repeatedly ordered

3

Turner to get on the ground. *Id*. at 0:00:42-50. Turner ignored Campos and continued running. Turner made his way into a nearby residential neighborhood, and Campos followed behind with Turner in sight. *Id*. at 0:00:50-0:01:44.

Calderon then arrived once again, pulling up to join the chase in his patrol car and stopping it as Turner moved into the carport area of a home. *Id*. at 0:01:44. Campos arrived on foot at the carport seconds later, and he and Calderon then confronted Turner in the carport. As Campos approached, Calderon drew his taser and pointed it at Turner. *Id*. at 0:01:44-0:02:13. The officers ordered Turner to the ground and within a few seconds Calderon walked up to Turner and fired his taser; the taser can be heard discharging at around 1 minute 53 seconds into the video from Campos's body-worn camera. *Id*. One taser prong is visible on the video in Turner's back. *Id*. at 0:02:05-12. The other prong appears in the video to have lodged in the front of Turner's right thigh. *Id*. at 0:03:38. The officers soon handcuffed Turner and patted him down. They discovered a loaded gun magazine in Turner's pocket. Tr. at 13:24-25. At that point Calderon directed another officer, Valdez, to secure Turner's car and check for a firearm. Tr. at 14:2-11. When officers discovered a pistol in the car's console they then searched the entire car, including the trunk. And at that point officers discovered the marijuana in the trunk. *See generally* Mot. at 5 (providing timeline).

Turner filed the instant motion to suppress, seeking to suppress the evidence discovered during the officer's searches of Turner and his car.

## Analysis

### A.   The Warrantless Searches of Turner and His Car Were Authorized.

Although the search of Turner and Turner's car were warrantless, they were nonetheless authorized under the circumstances. Automobiles may be searched without a warrant if there is

probable cause to believe that the car "contains contraband or other evidence of a crime." *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995); *accord Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821 . . . (1982), authorizes a search of any area of the vehicle in which the evidence might be found."). "Whether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *Id*. (quotation omitted). A warrantless search of a person may be conducted pursuant to a lawful arrest. *Bey v. Prator*, 53 F.4th 854, 858 (5th Cir. 2022) ("'When an arrest is made, it is reasonable for the arresting officer to search the person arrested.'" (quoting *Chimel v. California*, 395 U.S. 752, 762-63 (1969)).

There's little doubt regarding probable cause to believe the car contained contraband or other evidence of a crime at the time officers searched it. Just before this search, officers discovered a loaded gun magazine in Turner's pocket after they subdued and arrested him following his fight with and flight from Calderon. *See United States v. Fiesco*, 21 F.3d 1108, 1994 WL 171614 at * 4 (5th Cir. 1994) (per curiam, unpublished but precedential) (inference of guilty knowledge can be drawn from suspect's flight from authorities), *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (officers had reasonable suspicion to stop defendant for further investigation following his flight from lawful traffic stop); *see* Tex. Penal Code § 38.03(a). At that point, Turner had physically resisted Calderon's attempts (justified or not) to place him in handcuffs, ignored police commands to stop and get on the ground, and fled from police. There is no state-law right to physically resist even an unlawful arrest in Texas. *See* Tex. Penal Code § 38.03(b) ("It is no defense to prosecution under this section that the arrest or search was unlawful."). Moreover,

Calderon also testified that he smelled marijuana as he approached Turner's vehicle, which, if credible, alone likely justified a search for the presence of drugs. *See e.g.*, *McSween*, 53 F.3d at 686-87 (citing *United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989), *United States v. Henke*, 775 F.2d 641, 645 (5th Cir.1985), *United States v. Gordon*, 722 F.2d 112, 114 (5th Cir.1983), and *United States v. McLaughlin*, 578 F.2d 1180, 1183 (5th Cir.1978), for the proposition that the smell of marijuana "in itself" justifies a search of a vehicle). Once Turner resisted and fled, officers were justified in searching his pockets after they caught up to him, subdued him, and secured him in handcuffs. *See Chimel*, 395 U.S. at 762-63 (providing, "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape"); *see also Riley v. California*, 573 U.S. 373, 383 (2014) (same).

    **B.**    **Officer Calderon's Initial Attempt to Handcuff Turner and the Eventual Use of a Taser Do Not Warrant Suppression of Evidence.**

Turner's efforts to suppress evidence fail because he cannot rely on Calderon's alleged excessive force, or the alleged initial illegal seizure and/or arrest, as a predicate to suppress evidence insufficiently connected to those alleged constitutional violations. Typically, a Fourth Amendment violation results in evidence suppression when the violation is connected to the acquisition of the evidence and where exclusion vindicates the interests protected. *See Hudson v. Michigan*, 547 U.S. 586, 592-93 (2006). For example, when a warrantless search unsupported by probable cause yields incriminating evidence, the evidence can be subject to suppression.

But suppression of evidence is not an available remedy for an alleged Fourth Amendment violation where there is no "causal connection . . . between the alleged police misconduct and the obtaining of the evidence that the defendant asks [ ] to suppress." *United States v. Watson*, 558 F.3d 702, 705 (7th Cir. 2009), *see also United States v. Edmonds*, 606 Fed. Appx. 656, 660 n.3 (3d Cir. 2015) ("Because there is no causal connection between the search and seizure and the

force used, the exclusionary rule does not provide Edmonds a basis to obtain suppression"); *cf. United States v. Edwards*, 666 F.3d 877, 886-87 (4th Cir. 2011) (declining to adopt but-for test because it wasn't requested by the Government and holding that where sexually invasive search was performed in an unconstitutionally dangerous manner suppression of the evidence was appropriate). Likewise, suppression isn't warranted when it wouldn't serve the purpose of the rule alleged to have been violated. *See New York v. Harris*, 495 U.S. 14 (1990).

Further, suppression of evidence is not an available remedy when the causal connection between the alleged Fourth Amendment violation and the discovery of the evidence is too attenuated. *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018). Turner's causation problem is evident even as he invokes his alleged initial *de facto* arrest by Calderon, which Turner claims then set off a chain of events ultimately leading up to the search and seizure of evidence. Even a but-for causal connection between a Fourth Amendment violation and the act of obtaining evidence is not necessarily sufficient to warrant suppression. *Id.* (citing *Hudson*, 547 U.S. at 592-93). An "intervening development of probable cause to justify a previously unlawful arrest is an 'important attenuating factor,'" although not itself necessarily sufficient to establish attenuation. *See id.* at 910 (discussing other factors to consider in context of incriminating statements obtained after illegal arrest) (quotation omitted). In evaluating whether the causal connection is too attenuated to justify suppression of evidence, courts consider temporal proximity of the misconduct relative to the discovery of the evidence, intervening circumstances, and "the purpose and flagrancy of the official misconduct." *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) and clarifying attenuation doctrine's purpose is to "evaluate[] the causal link between the government's unlawful act and the discovery of evidence." *Id.* at 238).

Here, the evidence was not obtained *because* excessive force was allegedly used or even because Turner was placed under *de facto* arrest. Other key events were far more significant in the causal chain leading to the search: Turner's car was searched *after* Calderon says he smelled marijuana as he approached the car during an indisputably lawful stop, *after* Turner resisted Calderon physically, *after* Turner fled and ignored repeated instructions to stop and get to the ground, and *after* officers found a loaded magazine in Turner's pocket. As described in the section above, once Turner physically resisted Calderon's attempt to handcuff him, the officers had probable cause to arrest Turner for resisting, and to search Turner and his car—all of which are significant intervening circumstances.

And this analysis wouldn't change even if a hypothetical seizure or arrest at the time Turner was initially pulled over would've been unlawful, because no such unlawful seizure actually took place. Turner never submitted to Calderon's authority, and he immediately resisted Calderon's physical attempt to handcuff him. *See United States v. Wright*, No. 21-4089, ---F.4th ----, 2023 WL 240687, *5 (5th Cir. Jan. 18, 2023) (selected for publication) (noting officer's assertion of authority alone may constitute seizure if defendant submitted to that authority). It is clear from the undisputed facts that no seizure was completed until *after* officers caught up with the fleeing Turner and placed him in handcuffs. Simply put, "'a fleeing man is not seized until he is physically overpowered.'" *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)). It was the events emanating from the arrest following Turner's flight that ultimately culminated in the discovery of the evidence at issue here. Those events caused the search that resulted in evidence being found, not the initial decision to place Turner in handcuffs (or even the decision to deploy the taser). Finally, to the extent the decision to place Turner in handcuffs was the first in a chain of events leading to the search of the car, that decision was at worst legally dubious and certainly does not

rise to the level of "flagrant" misconduct. This, coupled with the intervening circumstance of Turner's resistance and flight, necessitates a finding that suppression is not warranted here.

The cases Turner invokes in support of his suppression efforts do not alter the Court's conclusion. For example, in *United States v. Muse*, No. CR 18-75, 2018 WL 6523383, at *1 (E.D. La. Dec. 12, 2018), unlike here, no events intervened between the defendant's unlawful *de facto* arrest and the search that revealed incriminating evidence. And had Calderon successfully handcuffed Turner and then proceeded, without more, to search Turner and his car, things might be different for his efforts at suppression.[1] But that is not what happened. Instead, the chain of causation here between Calderon's attempted detention of Turner and the search, of course, is broken by Turner's flight and refusal to comply with officers' instructions, as well as Turner's possession of a loaded magazine in his pocket. *Muse* also did not involve a lawful traffic stop; it instead involved officers who only smelled marijuana on the street and then arrested the suspect based on nothing else. *Id*. at *7. Turner's other cited cases are likewise distinguishable, as discussed in the Government's post-hearing briefing. *See* Dkt. No. 46 at 4-6.

### C. The Propriety of the Initial Handcuffing and Later Use of a Taser Need Not Be Addressed at This Juncture.

Having concluded that suppression is not an appropriate remedy here, it bears noting that Turner raises significant arguments about the degree and type of force used. It is not clear to the Court whether Calderon was justified in attempting to handcuff Turner initially. As the

---

[1] Such a sequence of events would put Turner more in line with the fact pattern in *Wright*, 2023 WL 240687, another case Turner has cited. *See* Dkt. No. 54 (advisory). In that case, the Fifth Circuit found the defendant had been seized when the officer pulled behind his car with emergency lights and ordered him to remain in his vehicle. Although the defendant did not comply fully with some commands, his behavior did not show "defiance to the Officer's authority" and he "did not attempt to flee or terminate the encounter." *Wright*, 2023 WL 240687, *6. The Court then proceeded to analyze whether that seizure was lawful and whether the resulting evidence should be suppressed.

Government concedes, the analysis boils down to the reasonableness of Calderon's actions under the circumstances and whether they amounted to a *de facto* arrest. *See* Gov't Post-Hearing Br at 2; *see also* Turner Post-Hearing Br. at 6-7. Calderon asserts that officer safety and Turner's safety warranted placing Turner in handcuffs at the outset of the interaction. Given that a search of the car for drugs would've likely been justified due to the scent of marijuana Calderon says he detected, and given that the roadway was a busy one, the Government may be correct. But Turner points out that there were individuals close to the traffic stop who were smoking, *see* Tr. at 26:5-10, and Calderon didn't testify that he smelled marijuana necessarily coming from the car and not from those individuals, *see* Tr. at 7:17-21; 24:17-20.

The propriety of the use of a taser is also raised. It is true that Turner fought Calderon and then ran from him. But Turner was exhausted from running when Calderon and Campos caught up to him, and Turner appeared in the various videos to be in the process of surrendering when the taser was deployed. But events transpired quickly, as the video evidence reveals. Calderon testified that he saw an object in Turner's hand. It turned out it was a phone. The video evidence is not conclusive, as far as the Court can tell. The Court need not get to the bottom of this because the use of "excessive force does not warrant suppression of evidence obtained during an otherwise lawful search." *United States v. Wijetunge*, No. CRIM.A. 15-144, 2015 WL 5098667, at *5 (E.D. La. Aug. 31, 2015) (citing *United States v. Garcia–Hernandez*, 659 F.3d 108, 114 (1st Cir. 2011), *Watson*, 558 F.3d at 704-05). *See also Edmonds*, 606 Fed. Appx. at 660 n.3 ("regardless of the amount of force used, the officers had reasonable suspicion to engage in a *Terry* stop and the [evidence] would have been discovered"). Here, for the reasons stated above, the search of Turner following his apprehension was lawful, and the outcome of the present motion to suppress would not be altered even if it were determined that use of a taser wasn't warranted.

## Conclusion

For the reasons stated above, the Motion to Suppress, Dkt. No. 26, should be **DENIED**.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. The objecting party shall file the objections with the Clerk of the Court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 25th day of January, 2023.

                                                  _____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE